**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Michael Clifton CHASE, Defendant–
Appellant.**

**No. 92–5639.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 27, 1993.

Decided March 4, 1994.

**ARGUED:** Michael P. O'Connell, Federal Public Defender, Charleston, South Carolina; John P. Bowler, JOHN P. BOWLER & ASSOCIATES, P.A., North Charleston, South Carolina, for appellant. Albert Peter Shahid, Jr., Assistant United States Attorney, Benjamin A. Hagood, Jr., Assistant United States Attorney, Charleston, South Carolina, for appellee. **ON BRIEF:** Margaret B. Seymour, United States Attorney, Charleston, South Carolina, for appellee.

Before WIDENER and WILKINS, Circuit Judges, and SPROUSE, Senior Circuit Judge.

## OPINION

SPROUSE, Senior Circuit Judge:

This appeal from a conviction of first degree murder committed on a United States military reservation involves the determination of whether a homicide conviction can be sustained if the victim initially survived an assault, lived for nearly seventeen years, but eventually died as a result of injuries suffered in the attack. In particular, we must decide the continuing vitality of the federal common law rule barring indictment and trial of a defendant for murder when the victim's death occurred more than a year and a day after the fatal attack was perpetrated. Other issues raised by the appellant are not critical to our decision.

### I

On the morning of May 15, 1973, Janet Willey's husband left their home, which was in the base housing area of a United States military compound near Beaufort, South Carolina. Later that morning, Willey's four year old son found his mother unconscious and bleeding from the head. A hammer with blood stains was found in an adjoining room. There were no eyewitnesses to the assault,

but six sets of fingerprints were found in the home. Willey did not immediately die as a result of the hammer wounds. In fact, she survived for nearly seventeen years. In the years after the attack, however, she had considerable difficulty communicating and suffered from epileptic seizures.

On February 14, 1974, Willey and her husband met with an FBI agent to discuss the crime. Through gestures and with the aid of her husband as an "interpreter," Willey described how, on the day of her attack, two young boys came to her house after her husband had left. One of the young boys departed, and Willey asked the other to leave as well. She went to the bathroom and, upon returning, encountered the older boy leaving the bedroom where the bloody hammer was later found. The FBI later determined that there had been twenty-two white school boys absent or late from the local school on the day of the attack. The United States Attorney's Office refused to allow fingerprinting of all the absent children, and the investigation was closed.

In June of 1982, Michael Clifton Chase, the appellant here, was in prison in Oklahoma on an armed robbery conviction. He was serving his sentence in the protective custody unit because he had disclosed information that had led to a shakedown at that prison. Supposedly in fear for his life, Chase contacted the FBI and confessed to killing a woman in a military housing area near Beaufort, South Carolina. Chase sought to be transferred out of the Oklahoma prison in exchange for this confession. Chase's confession matched the known facts of Willey's attack in a number of ways:

> The location was the same, and the dates were within three months of each other.

> Chase described watching, from an open field, a man leaving a house at the base. There was an open field near the Willeys' house.

> Chase said he entered the house through the front door. Fingerprints on that door matched Chase's.

> Chase correctly described the layout of the Willeys' house and the color scheme in Janet Willey's bedroom.

> Chase said he hit a 35- to 40-year old woman on the left side of the head while she was sleeping. Willey was 39 and was found lying in bed after the attack.

The United States declined to prosecute the matter even after Chase offered to waive any expired statute of limitations for assault.

Seven and one-half years after the alleged confession and over sixteen years after the 1973 assault, Willey was found dead in her Florida home on January 17, 1990. She had evidently died some time earlier, for her brain was in an autolytic state and was not susceptible to examination at autopsy. A medical examiner investigated Willey's medical history and concluded that she had died of an epileptic seizure which had been caused by the 1973 blow to her head. On April 10, 1991, Chase was indicted for first degree murder. He was then tried and convicted by a jury in January 1992.

Chase was sentenced to life imprisonment. The district court held that the sentencing guidelines were inapplicable because the crime was committed on the day on which the blows were administered, not the date of death, and the attack occurred before the sentencing guidelines were in effect. Chase appeals his conviction. The government initially appealed the district court's determination as to the applicability of the sentencing guidelines but later withdrew that appeal.

■ Chase contends that his indictment and trial were barred by the year and a day rule and the statute of limitations,[1] that his Fifth Amendment right of due process of law was violated by the government's delay in bringing him to trial, and that the trial court committed reversible error by not granting him a new trial when it was discovered that jurors considered information coming into their possession from outside the trial proceeding.[2] We only consider Chase's argu-

---

1. The five-year federal statute of limitations for assault and other non-capital offenses is contained in 18 U.S.C. § 3282. There is no statute of limitations for offenses punishable by death. 18 U.S.C. § 3281.

2. After the agreement on the verdict, but before the verdict was announced and the jurors polled,

ment that his prosecution is barred by the year and a day rule. In *Ball v. United States*, 140 U.S. 118, 133, 11 S.Ct. 761, 766, 35 L.Ed. 377 (1891) (*"Ball I"*), the United States Supreme Court recognized that the common law's ancient year and a day rule is applicable to federal prosecutions for murder. Over one hundred years have passed without legislation or a Supreme Court holding overruling *Ball I*, so we are constrained to apply it here and reverse Chase's conviction.

## II

■ In *Ball I*, the Supreme Court was confronted with an appeal of convictions in a murder case in which three defendants had been charged with shooting and killing a man in the Chickasaw Nation Indian Territory on June 26, 1889.[3] The victim was shot ten times, but the indictment failed to allege either the time or place of death. Although the trial was held less than one year after the shooting, the Supreme Court quashed the indictment as insufficient and fatally defective. In reaching that decision, the Supreme Court said:

> The indictment charges an assault by the defendant upon one William T. Box with a loaded gun, with the infliction of mortal wounds by the discharge of its contents, "of which mortal wounds the said William T. Box did languish, and languishing died." This fails to aver either the time or place of the death. By the common law, both time and place were required to be alleged. It was necessary that it should appear that the death transpired within a year and a day after the stroke, and the place of death equally with that of the stroke had to be stated, to show jurisdiction in the court. The controlling element which distinguished the guilt of the assailant from a common assault was the death within a

year and a day, and also within the same jurisdiction.

*Ball I*, 140 U.S. at 133, 11 S.Ct. at 766 (citing *Commonwealth v. Macloon*, 101 Mass. 1; *Chapman v. The People*, 39 Michigan, 357, 360; *Riggs v. State*, 26 Mississippi, 51; *People v. Wallace*, 9 California, 31; 1 Bish. Cr.Pro.3d ed. @@ 407, 408; 2 *Id.* @ 534; Wharton, Homicide, 2d ed. @@ 845, 846). In the penultimate paragraph of the opinion, the Court reiterated the effect of the inadequate indictment: "Defendants were well charged with assault, but not with murder, and the verdict must be held to have related only to that which was well charged, upon which no such judgment as that before us [conviction of murder] can be sustained."

The indictment was quashed after remand, but a new indictment was returned against all three defendants, including the one who had previously been acquitted by the jury. The primary modifications in the new indictment were allegations identifying the place of the murder and stating that the victim's death occurred immediately after the fatal gunshot wound. All three defendants were convicted in the second trial, and the case was again appealed to the Supreme Court. In *United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896) (*"Ball II"*), the Court reversed, on double jeopardy grounds, the conviction of the defendant who had been previously acquitted but, the year and a day rule having been satisfied, affirmed the convictions of the other two defendants. The principle of double jeopardy was held not to bar the second prosecution of the previously convicted defendants because their convictions had been reversed on the basis of the defective indictment. *Ball II*, 163 U.S. at 671–72, 16 S.Ct. at 1195–96.

Although there has been little discussion of *Ball I* since it was decided in 1891, the

one juror told the others that Chase had been incarcerated in Oklahoma for armed robbery. While the fact of incarceration had been introduced at trial in connection with Chase's 1982 confession, it was not revealed why Chase had been in prison at that time. On the day after the trial, a juror called Chase's lawyer and informed him that at least one juror had possessed information about Chase's prior criminal history. The district court held a hearing, at which it

learned that at least three jurors had gleaned that information from extraneous sources: newspaper or television reports or conversations with family members who had seen such reports. The district court determined, however, that Chase was not prejudiced by this knowledge and refused to order a new trial.

3. The jury acquitted one of the defendants.

Supreme Court and the Eighth Circuit, in deciding other issues, have recognized its continued vitality. In *Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), the appellant, in a federal habeas petition, had relied on *Ball II* to support certain double jeopardy contentions. The Supreme Court held that *Ball II* was inapposite, *id.* at 467–68, 93 S.Ct. at 1072–73, and, in passing, uncritically recognized the "year and a day" holding in *Ball I*: "This Court reversed the convictions [in *Ball I*] on the ground that the indictment was fatally deficient in failing to allege that the victim died within a year and a day of the assault." *Id.* 410 U.S. at 467, 93 S.Ct. at 1072. *See also Hagner v. United States*, 285 U.S. 427, 431, 52 S.Ct. 417, 418, 76 L.Ed. 861 (1932).

In *Merrill v. United States*, 599 F.2d 240 (8th Cir.1979), the petitioner mounted a collateral attack under 28 U.S.C. § 2255 on his conviction for "killing" in the course of a bank robbery in violation of 18 U.S.C. § 2113(e). He contended that his indictment was fatally defective because it did not allege that death occurred within a year and a day after the bank employee was beaten. The Eighth Circuit, although deciding against the defendant on other grounds, recognized the *Ball I* rule and noted its applicability in an indictment for "killing" during a bank robbery. *Id.* at 242. In its discussion of *Ball I*, the *Merrill* court stated: "[T]he allegation as to the time of death [in *Ball I*] was necessary to show that the death occurred within a year and a day from the date of the infliction of the injury...." *Id.* at 242. There is, therefore, persuasive dicta acknowledging *Ball I's* holding that the year and a day rule is applicable in federal prosecutions for murder.

In the case at hand, however, the government argues that this long-dormant rule should no longer be recognized for two principal reasons. First, it stresses that the 1909 congressional codification did not include the year and a day rule in the definition of homicide. "Murder is the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). This definition includes no explicit requirement that the victim die within a year and a day of the date on which

the fatal blow was struck. On the other hand, there is no indication in the legislative history that Congress specifically intended to eliminate the rule's requirements. In these circumstances, rules of statutory construction are helpful, and we are particularly mindful of the familiar maxim that "a statutory term is generally presumed to have its common-law meaning." *Evans v. United States*, —— U.S. ——, ——, 112 S.Ct. 1881, 1885, 119 L.Ed.2d 57 (1992) (quotations and citations omitted).

In *Evans*, the Supreme Court employed this well-recognized canon to interpret the meaning of "extortion" under the Hobbs Act, 18 U.S.C. § 1951. The Court reviewed the legislative history of the Hobbs Act, the statutory text, and state court treatment of the meaning of extortion. Finding no statutory language or legislative history to the contrary, the Court concluded that the meaning of extortion under the Hobbs Act was coextensive with the common law definition of that crime.

> "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."

*Evans*, —— U.S. at ——, 112 S.Ct. at 1885 (quoting *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952)).

In modifying the definition of murder in 18 U.S.C. § 1111(a), Congress used the term "unlawful killing." That phrase is not further explained. The legislative history of § 1111 contains no extended discussion of the meaning of "unlawful killing," nor does it indicate an intent to abrogate the common law understanding of that term. To the contrary, the relatively meager legislative history suggests that Congress, in enacting § 1111, did not intend to override the *Ball I* Court's ruling that a federal indictment for murder must include an allegation that death

occurred within a year and a day of the fatal blow.[4]

██ In an argument we are sympathetic to, but ultimately not swayed by, the government also characterizes the year and a day rule as evidentiary in nature and contends that the rule is inconsistent with the philosophy behind the Federal Rules of Evidence;[5] therefore, the government urges, the rule was eliminated as a principle of federal criminal law when the Federal Rules of Evidence were adopted.[6] One of the fatal weaknesses of the government's argument, however, is that the year and a day rule is a principle of substantive law, not a rule of evidence. The original source of the Supreme Court's authority to promulgate rules of evidence and the procedures by which those rules were to be enacted was 28 U.S.C. § 2076. That section was repealed in 1988. Pub.L. 100–702, Title IV, § 401(c), Nov. 19, 1988, 102 Stat. 4650. The Supreme Court's authority to prescribe general rules of evidence now stems from 28 U.S.C. § 2072. Section 2072(b) states: "Such rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). That statute reinforces the well-recognized principle that the adoption of rules of evidence and procedure is not a vehicle for amending substantive law. *See United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941).

Nevertheless, in support of its position, the government relies on *Louisville, Evansville*

---

4. The federal statute defining murder, 18 U.S.C. § 1111, was first codified in 1909 as part of a general revision and codification of federal statutes. Special Joint Comm. on the Revision of the Laws, Revision & Codification of the Laws, Etc., H.R.Rep. No. 2, 60th Cong., 1st Sess. 12 (1908). In addition to proposing a statute that would define homicide, the Special Joint Committee expressed the need to enact language specifying that United States courts would have jurisdiction over deaths that resulted from blows inflicted on the high seas, whether the victim died at sea or on land. *Id.* This language was deemed necessary because "the Supreme Court of the United States, in one case at least, has held that an averment in the indictment of the place of death is an essential allegation." *Id.* (citing *Ball I*). While its report expressed some skepticism about whether it was necessary to specify the place of death, the Special Joint Committee was clearly influenced by the Court's decision in *Ball I.* Especially relevant to the issue in this case was the complete absence of any committee discussion of the *Ball I* Court's ruling that a federal indictment for murder must allege that death occurred within a year and a day of the fatal blow, even though the Special Joint Committee's report evinces an awareness of the *Ball I* decision.

*Cf. United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). In *Jackson,* the Supreme Court refused to extend the capital punishment provision of the Federal Kidnapping Act, 18 U.S.C. § 1201(a), to cases where the defendant pleaded guilty or waived his right to a jury trial. "Not a word in the legislative history so much as hints that a conviction on a plea of guilty or a conviction by a court sitting without a jury might be followed by a separate sentencing proceeding before a penalty jury." *Id.* at 578, 88 S.Ct. at 1214. Where Congress, in two different federal statutes, had provided for capital sentencing procedures in cases where a defendant had been convicted without a jury and where the legislative history of the Federal Kidnapping Act was silent on that subject, the Court refused to correct Congress' inadvertent oversight. *Id.* at 578–79, 88 S.Ct. at 1214–15. Likewise, we are not at liberty to assume that Congress intended to abrogate the year and a day rule where the legislative history is silent on that issue but discusses other aspects of the *Ball I* decision.

5. The government correctly notes that the purpose behind the Federal Rules of Evidence is to promote "growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Fed. R.Evid. 102. Rule 401 defines relevant evidence to be "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Rule 402 states, "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to its statutory authority." Fed.R.Evid. 402. The year and a day rule, to say the least, precludes the prosecution from presenting evidence that may be probative of the cause of death. For reasons developed *infra* in the text of this opinion, however, that consideration is not of sufficient force to carry the government's argument.

6. The Rules of Evidence were designed and adopted by the Supreme Court and became effective on July 1, 1973. This was 46 days after the attack on Janet Willey, but because we find that the year and a day rule is a rule of substantive law and could not have been abrogated by the enactment of the Federal Rules of Evidence, we do not address defendant's assertion that recognizing such an abrogation in this case would constitute a violation of the *ex post facto* clause of the United States Constitution.

& St. Louis R.R. Co. v. Clarke, 152 U.S. 230, 14 S.Ct. 579, 38 L.Ed. 422 (1894), in which the issue was whether the year and a day rule should be extended from the criminal context to a civil wrongful death suit by the executor of the deceased's estate. The Clarke Court declined to recognize the rule in the civil context, in part because the public's interest in fairness and justice in the area of criminal law does not apply with equal force to a private party's action for compensation. Id. at 242, 14 S.Ct. at 582. In a passing reference, the Court characterized the year and a day rule as one of evidence. Id. at 241, 14 S.Ct. at 581. That reference, however, must be viewed as dicta, as the issue before the Court in Clarke was not the nature of the rule and did not involve its interpretation in a criminal context.

█ There is no question that the year and a day rule has long been recognized in the common law as a substantive legal principle.[7] See 4 William Blackstone, Commentaries *197 ("In order also to make the killing murder, it is requisite that the party die within a year and a day after the stroke received, or cause of death administered. . . ."); 3 Edward Coke, Institutes of the Laws of England *47 ("Murder is when a man of sound memory, and of the age of discretion, unlawfully killeth . . . with malice afore-thought, either expressed by the party, or implied by law, so as the party wounded, or hurt, etc. die of the wound, or hurt, etc. within a year and a day after the same.").

More recent commentators noting Ball I have observed that the year and a day rule is a rule of substantive law. See Jeffrey F.

Ghent, Homicide as Affected by Lapse of Time Between Injury and Death, 60 A.L.R.3d 1323, 1327 (1974) ("Numerous cases from a wide variety of jurisdictions support the common-law rule that in order to constitute punishable homicide, death must issue within a year and a day from the infliction of the mortal wound.") (citing Ball I and numerous state cases); Roderick Terry, Homicide: The Viability of the Year and a Day Murder Rule, 31 How.L.J. 401, 403 (1988) ("The [Ball I] Court adopted the common-law rule which requires that the specific time of death must be alleged in the indictment" to distinguish murder from assault); Donald E. Walther, Taming a Phoenix: The Year-and-a-Day Rule in Federal Prosecutions for Murder, 59 U.Chi.L.Rev. 1337, 1341 (1992) (Ball I Court's language implied that the rule is a substantive one); 40 Am.Jur.2d Homicide § 14 (1968) ("Most jurisdictions follow the common-law rule that, in order to constitute punishable homicide, death must ensue within a year and a day of the infliction of a mortal wound.") (citing Ball I).

As a matter of state law, many state courts confronted with the rule have recognized it as a substantive rule of law. See e.g., People v. Corder, 306 Ill. 264, 137 N.E. 845, 849 (Ill.1922); State v. Moore, 196 La. 617, 199 So. 661, 662–63 (1940); State v. Zerban, 617 S.W.2d 458, 458–59 (Mo.1981); State v. Young, 77 N.J. 245, 390 A.2d 556, 559 (1978); State v. Gabehart, 114 N.M. 183, 836 P.2d 102, 105–06 (1992); Ohio v. Sandridge, 5 O.O.3d 419, 365 N.E.2d 898, 899 (Ohio 1977). An instructive example is State v. Young, in which the New Jersey Supreme Court relied

---

7. The Ball I Court seemingly applied the year and a day rule as a conclusive presumption: an approach consistent with the common law view of the nature of the rule. "A presumption is a rule of law, statutory or judicial, by which [a] finding of a basic fact gives rise to existence of presumed fact, until [the] presumption is rebutted." Black's Law Dictionary 1185 (6th ed. 1990). "Conclusive presumptions are inferences which the law makes so peremptorily that it will not allow them to be overturned by any contrary proof, however strong." John Bouvier, Bouvier's Law Dictionary 2678 (8th ed. 1914) (emphasis supplied).

A conclusive or irrebuttable presumption is considered a rule of substantive law. Michael H. v. Gerald D., 491 U.S. 110, 119–20, 109 S.Ct.

2333, 2339–40, 105 L.Ed.2d 91 (1989); 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence, ¶ 300[01] (1993). ("It is . . . generally agreed that a so-called irrebuttable presumption is really a rule of substantive law. . . ."); Charles E. Torcia, Wharton's Criminal Evidence § 29 (14th ed. 1985) ("A so-called 'conclusive presumption' (or irrebuttable presumption) is not a presumption at all; it is, rather, a rule of substantive law."); David L. Faigman, Madisonian Balancing: A Theory of Constitutional Adjudication, 88 Nw.U.L.Rev. 641, 659 n. 79 (1994) (A conclusive presumption "is a substantive rule of law whereby proof of one fact compels acceptance of a second fact; no amount of proof will suffice to rebut the presumed fact.").

on the year and a day rule to reverse a conviction for first degree murder. Young had entered his estranged wife's house and shot a man five times. The victim initially survived but died from his injuries approximately fourteen months later. Young was first indicted for assault with intent to kill but, upon the victim's death, was also indicted for murder. In reversing the subsequent conviction for murder, the court stated:

> [W]e regard the year and a day rule as a constituent element of the crime of murder, not a mere rule of evidence. The rule does not create a rebuttable presumption of absence of causal relation between assault upon and death of the victim. The rule renders conclusive the absence of culpability for murder once the period of a year and a day has passed.

*Id.* 390 A.2d at 559 (footnote omitted). The court went on to abrogate the rule, but only prospectively because of its holding that it is a substantive rule of law. Our review of both ancient and modern commentators and state court opinions discussing the rule convinces us that the year and a day rule is a substantive rule of law that could not have been abrogated by the enactment of the Federal Rules of Evidence.

Some state courts have enunciated persuasive reasons to support eliminating the rule. As the Supreme Judicial Court of Massachusetts stated in abrogating the rule: "In particular the rule appears anachronistic upon a consideration of the advances of medical and related science in solving etiological problems as well as in sustaining or prolonging life in the face of trauma or disease." *Commonwealth v. Lewis,* 381 Mass. 411, 409 N.E.2d 771, 773 (1980). *See also United States v. Jackson,* 528 A.2d 1211 (D.C.1987); *Jones v. Dugger,* 518 So.2d 295 (Fla.1987); *People v. Stevenson,* 101 Mich.App. 61, 300 N.W.2d 449 (1980); *State v. Pine,* 524 A.2d 1104 (R.I.1987). We, too, recognize that modern forensic experts have many more resources at their disposal than did their ancient forebears. Furthermore, modern juries are capable of understanding forensic testimony, and modern rules of evidence are designed to facilitate its receipt and use by

juries. However, any further consideration of these concerns by a court of appeals is precluded by existing Supreme Court precedent. We are persuaded that the year and a day rule, as adopted in *Ball I,* is a substantive principle that is alive and controlling, until Congress or the Supreme Court instructs us otherwise.[8] For that reason, we reverse Chase's conviction and remand for proceedings consistent with the views expressed herein.

It is therefore unnecessary to consider the other issues which Chase raises.

*REVERSED AND REMANDED.*

8. *See Hutto v. Davis,* 454 U.S. 370, 374–75, 102 S.Ct. 703, 705–06, 70 L.Ed.2d 556 (1982).